Thank you. Good morning, Council, and good morning all. We will start this morning with the case of Wilson v. Director Office Workers Compensation Program and Department of Labor et al., 19-3542. And we will begin with the petitioner, Mr. Giuliano. Thank you, Your Honor. Good morning to the Court. Good morning to Council. May it please the Court, my name is Nicholas Giuliano. I represent Richard Wilson. Richard Wilson was a maritime worker, a dock builder, for almost 30 years, during which time he performed heavy construction work, usually of a maritime nature, and was exposed to extremely loud noises while doing that kind of work. When he retired in 2014, he was found to have a profound hearing loss of 46 percent. So he filed a claim under the Workers' Compensation Act, the Longshore Act, and his claim was repelled by his employer. We went to trial in the Office of Administrative Law Judges. Council, we're very familiar with the record and with the limited time we have. I'd ask that we turn to focus on some of the issues that are of most concern to the Court. If we might start with the threshold issue of whether a presumption applies here. And in particular, how a presumption as to CITUS could apply when that's really a jurisdictional element, and a presumption as to federal jurisdiction would seem to be putting the cart before the horse when it comes to the burden of a plaintiff and appellant to show that they belong in federal court. What's your response to that? The presumption is written into the statute itself. Section 920A of the Longshore Act provides a presumption of coverage. In addition, if we were to, let's say, adopt the rule that was taken by the Second Circuit in the Fleischman case, the presumption would apply to questions of fact relating to the issue of substantive jurisdiction. The trial judge in the Administrative Law level held that the presumption didn't apply at all and imposed the burden of proof, both with respect to factual matters, naturally, with respect to factual matters on Mr. Wilson. That makes sense. Traditionally, when we talk about coverage, it relates to factual issues where a presumption would apply. But why should we extend the concept of a presumption to the threshold question of jurisdiction? Even in Fleischman, the court looked at what the ALJ did there in terms of error in not applying the presumption to facts. It then went on to conclude that it was harmless because it had treated the legal issue, the situs issue, de novo, which it knew, and reviewing that question, de novo, be consistent with Fleischman. Reviewing it de novo, I think, would be consistent with Fleischman. What I'm pointing out with regard to the presumption is that the trial court placed on Mr. Wilson the burden of coming forward with proof of navigability. I think that the proper approach would be to place the burden on the employer to come forward with the proof of non-navigability. Except in cases like Crowell v. Benson, the Supreme Court says when we have jurisdictional facts, I mean, as Article III courts of limited jurisdiction, we have an obligation to satisfy ourselves of jurisdiction. So I don't see how the merits of the statute can come into play. I mean, yeah, sure, we can apply the presumption to whether he was, you know, involved in a an occupation covered by LUCA and other things, but as to whether the waters are navigable, we have to decide that before we get into the statute. Yes, and the question of navigability is often said to be a mixed question of law and fact. So to the extent that the fact questions are involved in making a determination of navigability, the presumption should apply to those factual questions. Do you have any case that has dealt with this kind of jurisdictional fact issue and held the presumption applied to it? I believe the case I cited was a Fifth Circuit case. I don't know how to pronounce it, Mungia. That was cited in my brief, and the Fifth Circuit applied a presumption in that case. And I would go back. But that also included the Supreme Court's decision in the Greenwich Colliery, which said the burden as to jurisdiction rest for all matters, including jurisdiction, was resting on the plaintiff's appellant. Yes, I understand that. And again, if he gets the to the factual proof he puts forward, the presumption would assist in prevailing on proving the issue of jurisdiction. Maybe I can ask a related question, which is let's say your client isn't covered by LUICA. Can he seek benefits under the New Jersey Workers' Compensation statute here? He might be able to. I can't say for sure under the New Jersey Act whether it would provide coverage to somebody in a waterway. That was one of the main problems that required the development of the Longshore Act was that maritime law or land law stopped at the waterline. Maritime law picked up on the seaward side of the so-called Jensen Line. Okay, but if we decide that this is outside of federal jurisdiction, it reads to me as if the New Jersey statute would apply. So it's a question just of which scheme is going to apply to him. That may be so if the court were to rule that way. Like I said, I can't say for sure that the New Jersey statute would pick it up, but some of the workers' compensation statutes do overlap with the federal statute. Well, we can take up with the director the question of whether we're going to look to an ebb and flow test and how that might apply here. Would you focus, please, on the navigable in fact test and why you believe it's for the ALJ to find here that that test was not met? Well, I think the main question here is, first of all, what tests for navigability should apply to this water? And there are two possibilities, of course. I think Judge Krause is asking if we assume the test is not ebb and flow, even under the navigable in fact test, do you win? And if so, why? Yes, even under the navigable in fact test, because first we've got the Passaic River at the location of this job site, the Route 3 bridge, is approximately 120 feet wide, 10 feet deep, has an authorized federal navigation channel at that location that runs from Newark Bay, 17 miles north, so it includes the Route 3 bridge at mile 11.7. It's authorized. The federal government publishes a chart to aid navigators. That chart shows the entire length of that river, the 17 miles, could be navigable. In addition, the government publishes the coastal pilot reference. It's another reference for mariners to use when they're navigating coastal waters. It also shows the river to be navigable for the entire length of the lower Passaic River. In addition, before New Jersey built. Were either of those sources put before the ALJ? The chart was cited in my brief. The NOAA chart was cited in my brief. Which brief, in the brief to us or in the brief to the ALJ? In the brief to the ALJ. And it's a federal publication. Excuse me? Where is that in the record? Do you have a an appendix site for us? Not for the brief, no. But what is in the record is the also the permit that was issued by the United States Coast Guard. And that permit, not only for the Route 3 bridge, but for the bridge immediately near north. The permits describe the Passaic River at those locations as navigable waters of the United States. The permit advises New Jersey to ensure that in doing the work, the current navigable depths of the river are not impaired. In addition, the bridge has navigation lights built on it at the request of the U.S. Coast Guard. The bridge has a fender system below it. The fender system is designed in part to protect vessel traffic. And the river has a depth gauge in it. So that not only is the Coast Guard saying this is a navigable river, but the Coast Guard has required New Jersey to take steps to maintain the navigability of the river and to make it safe to navigate. Now the ALJ, I think the main problem for the ALJ was that the Army Corps of Engineers report talks about large ocean-going vessels, container ships. Some of them are 700 to 1,000 feet long. We're not suggesting at all that you could take an ocean-going container ship up the Passaic River, but you could take small shallow draft vessels the entire length of that river. With a 10-foot depth, it would be easy to take small tugs and barges. In fact, Mr. Wilson... Where is the evidence of the record that that is in fact happening? Because the ALJ concluded that there was not in fact commercial activity at that point in the river. Well, that's... So where in the record do we find evidence that there is? There isn't. There isn't except for Mr. Wilson's testimony that when he's worked on bridges even north of the Route 3 bridge, he sailed on tugs and barges hundreds of times. And what are the drafts on those tugs and barges? Is there any record evidence about that? No, there isn't. Do you have any record evidence about the draft required for a tug or a barge? Only in the cases I cited in my brief. Okay. And what's your best case for a barge requiring only, what, four feet or five feet? Four feet, seven. Some of the tugs, seven feet, eight feet. In fact, in the Army Corps report, they refer to a company. I think the company is the Cartolite Company. And that company was operating a dry cargo vessel that drew, I think, four feet of water. And this is in the Corps report? That's in the Corps report, yes. Counselor, you've actually exceeded time because I gather you had made a request initially of our clerk of court for some rebuttal time, which we've built in for you. So we will return to you on rebuttal. Okay. Thank you. And if we may hear now from Mr. Bush, and we thank you for your presence and input today. Thank you, Your Honor. May it please the programs of the Department of Labor. We're in this case to address the limited issue of whether the ebb and flow test still has viability. We agree with this court's previous analysis in Stokoe Homes and in Selleck that the navigability and fact test announced by late 19th century Supreme Court cases only expanded and did not contract the traditional understanding of the rivers. Mr. Bush, Kaiser Aetna from the Supreme Court tells us we need to be really careful to separate out at least four different purposes in navigability. And, you know, Rivers and Harbors Act is a commerce clause statute. And, you know, when we're dealing with navigational servitudes, that's different. But here we're dealing with admiralty jurisdiction and Stokoe Homes didn't purport to address that. Why should we extend, you know, a relatively expansive test that, you know, the commerce clause, we're looking at sort of hydrologic connection for environmental laws and things. Why should we extend that to the admiralty context? Well, there's a lot in your question that we thought about when we wrote our supplemental brief here. Kaiser Aetna does caution us that we have to be careful about the context that we're defining navigable waters in. In this case, we felt that we would have to, given the way the case law works, that the navigability and fact test was invented and applied in contexts above the title influence and in artificial waterways, we felt that we would have to find a reason to not to apply an ebb and flow test in the longshore context. And we were unable to find one in any case. And we think it serves the purposes of the act. I'm sorry, your honor. Let me ask about that, but whether there is or isn't a reason. I want to understand how these schemes fit together. As I understand it, the Jones Act and LAWICA kind of fit together, right? LAWICA is for seamen. And then there's some people who aren't seamen, but they're harbor workers or they're longshoremen or stevedores, right? But there's a third piece here, which is state jurisdiction. And New Jersey, maybe you can tell me this is atypical, but New Jersey's scheme appears to fill in the gaps and cover all marine workers who are injured on waters that aren't navigable waters of the U.S. So we have three parts here. If we expand the federal part, then we're going to be excluding the state part. Now, is New Jersey's scheme atypical for some reason that we should worry about here in your experience? I don't know if it's atypical or not, your honor. I wish I could claim to be an expert on all 50 state workers' compensation laws, but I'm not. I do know in this case that... Let's assume for the moment, and I'd be happy to take supplemental briefing if that turns out to be wrong. Let's assume New Jersey's not atypical and it's a gap filler. Why should we take a relatively expansive understanding of admiralty and thus an expansive approach to look on the Jones Act, rather than leaving these matters to state workers' comp schemes? Well, and I wanted to get to that issue of your aspect of your question too. We actually don't think this is an expansion, and we don't think that the Stokoe-Holmes rationale recognizes this as an expansion. We think it's been dormant, but we think it's been there all along because the waters that are navigable, in fact. But there's no case that said that that means that water is subject to the ebb and flow of the tides or no longer within. Let's bracket whether it's an expansion. If we're discussing between a more expansive or more restrictive possible reading of the cases, bracket which is better on the existing cases, why do you think it is a better reading to take a more expansive approach than a restrictive one that leaves more in the hands of states? Well, our concern is that, and I suppose I'm going contrary to the hypothetical a little bit here, because if New Jersey, we're worried about the risk that a worker could be left without a compensation remedy. And that's really our policy concern to the extent there is one here. Is there a policy concern about uniformity? I suppose there would be, that we would be worried that we wouldn't want to make a decision based on what happens in New Jersey or a set of states that would be different if another state were to restrict its coverage or change its coverage. And counsel, could we step back to the ebb and flow test that has been invoked historically for coastal waters and those tidal waters that connect to those waters? Could you speak to that issue and why it's important in terms of coast-to-coast coverage to have an ebb and flow test? Well, an ebb and flow test is certainly easy to apply to the extent that it's a factual question. It's an easy fact to establish, or I wouldn't say easy, but it's a relatively uncontroversial fact to establish and therefore aids administration of the Longshore Act. It's consistent with the exclusively on that in navigable and fact test. For example, to not only in practice, but it was capable of navigation. There would come a point around the shoreline where that test no longer would allow for navigable waters, right? Could you explain that a little bit further? I'm sorry. I'm trying to imagine a river in my head. Okay. How about a marsh or a tidal pool? I guess if I may finish the question, I guess I raised the concern that, and let's use coastal waters as our starting point, that the ebb and flow test, without that, there would come some point where the relation of the sand and the water meant that well before the shoreline, there was no longer at multi-jurisdiction. That is a concern on the facts of our coasts, I suppose. The director would not want a worker to be covered by the act upriver a little bit and then go out of coverage closer to the shore and then be in coverage again on the ocean. Is it your understanding that that was one of the purposes of ebb and flow to eliminate what was inconsistency in trying to draw lines around our nature of the ebb and flow and therefore we didn't want a ship drifting out from the coastline to actually drift out of admiralty jurisdiction in the process? Well, since 1972, people have been worried about workers moving in and out of coverage under the act. And certainly in other statutes and other statutory contexts where the ebb and flow test has been recognized as still consistency along those lines, just as you mentioned, so that federal authority wouldn't disappear and reappear at a certain point on what was essentially the same body of water. Mr. Bush. Thank you. I just finished that thought. Judge Viva. I'm sorry about that, Judge Krause, with the tech delays. So I want to ask about a different inconsistency. So if someone's on a vessel, the vessel is going to be covered regardless because a vessel can only go to a place that's navigable in fact. But is your test going to include, would the ebb and flow test include marshes or tidal pools or things like that that would never be counted as navigable in fact? Would they be included in the ebb and flow test? We think they would be. But would a worker be covered if he happens to step into something that's a marsh and then not covered if he steps out of it? Could you focus that on the on the longshore act that is before us and how that would apply? Yeah, like a longshore. Are there longshoremen who would be covered working in a marsh or a tidal pool who might also be doing work adjacent to the marsh or the tidal pool? Will that situation arise sometimes? It may. We think that, again, there are a number of sort of factors intersecting there. There are already cases where a worker working on a bridge project would be covered on a float stage on traditionally understood navigable in fact waters, assuming no ebb and flow tests, and would not be covered if he were standing on top of the cofferdam, which is permanently affixed to the seafloor. So workers are always going to move in and out of coverage. Whatever test we adopt, we're going to have a problem with the bridge worker who's on the land next to the water not being covered. But the bridge worker working on the float is going to be covered. So we're going to have some border issues. And the question is, how do we minimize that? Or what do we do about that? There are always border issues, Your Honor. Thank you. Could you address one of the issues when it comes to maritime torts? For example, in executive jet aviation, looking at what admiralty jurisdiction covers, the Supreme Court has looked to not only the navigability of the waters, but also an element of a maritime nexus. And so my question to you is, do we have that maritime nexus built into the act before us? And if so, does that address in part a problem of being concerned about the extent to which an ebb and flow test, for example, might take us out to a very small creek? Well, when the act was, well, to answer that last part, a very small creek that was still tied is something I'm having a little bit of a hard time imagining. But in 1972, when the act was first amended significantly, a status test, if that's what you mean by a maritime nexus test, or that's fairly close to a maritime nexus test in the tort context, was added. But the Supreme Court in Perrini said that that status test doesn't apply to workers who would have been covered before it was enacted. And thus, we end up in the situation we are today where any worker who's injured in the course of his duties on navigable waters, however that term is understood, is covered. I hope that answers your whole question. I'm sorry. Let me go back to a question Judge Bibas asked you. I think he suggested to you or asked you that wouldn't a longshoreman on a vessel, by definition, be in navigable waters and then yes, unless he were far enough out to see that he's a seaman, and then he's in Jones Act territory. So it's a whole other question, though. Okay. But if he were covered, then why go to the ebb and flow test if it's covered by default under the navigable in fact test? Well, we think nobody would. And that's one of the reasons this court is facing this issue for what may be the first time. As we addressed in our brief, that's one of the ways that if the navigability in fact test is what people were going to first, and they could make their case easily that way, this issue would never come up. So, I mean, that's one of the reasons why we think that, you know, in the Act's 93 years, there's no binding precedent in any court that eliminates the ebb and flow test. And we think one of the reasons is probably that water subject to the ebb and flow are almost overwhelmingly also navigable in fact. So we don't really decide it then if this is not a practical issue, if the water is navigable in fact. If this court were to decide that the water here where Mr. Wilson was injured was navigable in fact, then it would not be necessary to reach the ebb and flow issue. Do you take a position on whether a channel that's, what is it, 120 feet wide and 10 feet deep is navigable? We do not take a position on that as a matter of law. And generally, it's a factual question for the ALJ to weigh evidence and not the kind of thing that the director would weigh in on. And can I ask, conversely, if we were to conclude that the ebb and flow test applied here, would there be any reason to second guess the findings as to navigable in fact? I suppose there wouldn't be because then the ALJ would have applied an incorrect legal standard and the case would need to be remanded for consideration under the correct standard, which is exactly what we asked you to do in our brief. And how, if the ebb and flow test is viable in terms of the sequencing going forward, is it the director's position that an ALJ would then need to make a threshold determination as to which test applied? That's an interesting question. I don't know that it would have to be a threshold question. If we were to take the plain language of this court's SELAC case and say that in coastal waters, the test is ebb and flow, and in inland waters, the test is navigability in fact, that might suggest some difference. But we think if an ALJ were to make one finding or the other in favor of coverage, that that wouldn't be a legal error because they failed to consider the other tests. And what would be a problem, is there any situation where a worker who the director believes should be covered by the act would not be if the ebb and flow test were limited just to the coastal waters? And once that water came inland, we were to hold, for example, that it was then subject to the navigable in fact test. I don't think we would have an issue there, as I understand the question. That would be also an inland waterway not subject to the ebb and flow of the tide that is not navigable in fact. That would be well outside both the traditional test of navigability and the navigability in fact test. My question is inland water that is subject to ebb and flow but is coming inland from the coast. Is there a concern if the ebb and flow test did not extend to those inland waters subject to ebb and flow, that there are workers who would not be covered under the act whom the director believes are intended to be covered? I understand your question now. I'm sorry. Our position there would be that the waters are inland waters until the tide no longer affects them. So that's the tide we're speaking of. Unless you have a specific example of a body of water that you mean that's different than that. I'm way over my time but I'm perfectly willing to keep answering questions. I'm sorry. We appreciate the director's participation and extending your time. These are helpful responses to understand the dynamics of this statute. If I can go back for a moment in terms of the status test, how then does the nexus to the employer-employee maritime relationship currently function in the application of the statute? Do you mean whether or not the employer is a maritime employer? Yes. Okay. Well, that's a separate element. So a maritime employer has any employees in maritime employment. And so it doesn't have to be necessarily the employee whose case is before the ALJ or Mr. Wilson in this case. And from my review of the record in this case, there's been no finding on that. There may be a stipulation, but I'm not aware of it. The maritime employee status or the status test, as we call it in Section 2, is currently only applied to workers in adjoining areas or peers, that list of people who are not technically on the navigable water like Mr. Wilson was. And we feel bound to that definition by the Supreme Court's Perennia decision, which hasn't been overruled on that point. Understood. Thank you. Do my colleagues have any other questions? Again, Mr. Bush, we thank you and the Director for your time, both in preparation and in appearing today. Thank you for inviting us to participate on this interesting issue. And let's turn this over now to Mr. Thompson. May I please report? My name is Gabriel Thompson. I represent the employer Kramer Surbaran and the Carrier Arch Insurance Company in this matter. I'll go ahead and address the Section 20 presumption first, if you'd like. The presumption is inapplicable to any interpreted question to general import. The board has consistently held that presumption does not apply in legal interpretations involving jurisdiction under the statute. So the courts have applied the Section 20 presumption to situs when no substantial evidence is presented in the record, such as when the employer raises it on brief and there has been no objections to situs or status in that they raised the presumption. Should there be a presumption as to status? As to status, it's a jurisdictional element under, is the same as situs. If it's, if there's no evidence admitted into the record challenging that, the coverage for the act is present. That's what the case law says. And that's, let me see if I have, I do not have a citation to that. But if he's not on cover status, and even if the, excuse me, if the Section 20 presumption applies, the Benefits Review Board has already reviewed the evidence and found that it is harmless error and substantial evidence was offered to rebut the presumption. But then that gets into the navigability of the Passaic River. As mentioned before, Kaiser v. Aetna is the careful appraisal for the purpose for which the concept of navigability is invoked. In the two Third Circuit cases that you asked to be brief, the Stucco Homes dealt with the River and Harbors Appropriation Act of 1899. And the other act dealt with the, I believe the, the, it was another case with the Commerce Clause. They both have the ebb and flow test. In Aetna, Kaiser can be read as to reject the ebb and flow test as noted in the dissent. And the Longshore Act revives its legitimacy over the Admiralty and Maritime cases from Article 2, Section 2 of the Constitution. The ebb and flow test is also, it's not rejected by the majority in Kaiser. And whatever the dissent attempt to characterize it that way, you know, for in its arguments. And we have multiple cases, Victory Carriers, Executive Jet Aviation, PPL, Phillips Petroleum, where the Supreme Court in more recent times continues to refer to the ebb and flow test as a, as a way to ascertain Admiralty jurisdiction. Granted, they're not dealing with this particular statute, but where we have recognition of the ebb and flow test for Admiralty jurisdiction purposes in a multitude of contexts, why should we conclude that it is not applicable under this particular Act? There are other cases that have the George v. Director of Office of Fortune Compensation Programs. Substantial evidence was supported. The board's findings that the American River at the site of the accident wasn't navigable for the purposes of Longshore Harbors Workers Compensation Act. The board properly explained the test of navigability under 33 U.S.C. 903a is whether the water is now navigable. In fact, that is actually susceptible to commercial navigation. They cited Adams v. Montana Power, 528 Federal 2nd, 437 9th Circuit, and the Robert W. Parsons, 191 U.S. 17 1903, affirming the navigability in fact test and rejecting influence of the tides test. Counsel, that makes perfect sense with those cases that are dealing with inland. So to clarify my question, where we don't have cases that are rejecting the ebb and flow test when we're dealing with coastal waters and waters that are in fact subject to ebb and flow, why should we be the first court to say that is not a proper extension? In the case of inland waters where of course they're not subject to ebb and flow, but that's exactly where the Daniel Ball came into play with the Supreme Court articulating there that the test that it was invoking was for the river. And it's explicit that as to ebb and flow, that doesn't apply to the inland river with which it was dealing. The concern would be you would be looking at tidal marshes, and this is something that's very prevalent in Louisiana coastal system. You're looking at places with overgrown vegetation that are influenced by the tides, but no boat, even one with a very minimal draft, can get through everywhere that the high tide can cover. So then it would be invoking jurisdiction for all those areas where it's not exactly a place that the water is always inundated and only at high tide, there may be water in those portions of the marshes. Mr. Thompson, I'm not sure if we need to get there. As a matter of fact, you don't dispute that at the mile 11-7 and 11-8, this river is 120 feet deep and 10 feet wide, roughly, right? There's not a factual dispute on that. It's not 120 feet deep. I think the 100 feet wide and 10 feet deep. You don't dispute that factually? No, I think that's a fact that's established by the record. Okay, and as Mr. Giuliano testified, you know, there's, sorry, not testified, argued, the Army Corps report talks about vessels that have a draft of four feet, seven feet, eight feet. Some tugboats, some barges can traverse with drafts around that, right? I mean, that's established by the report. Is there any dispute about that? No, there's no dispute what's in the report, no. Okay, so vessels are, commercial vessels are capable of traveling with a draft of less than 10 feet. They may. They are not. So they're going up this river, not that they could go up this river. Correct. All right. Now, is there any dispute? Mr. Giuliano was talking about this bridge having navigation lights and the fender system and the Coast Guard mandating a depth gauge there. That's all in this channel as well, isn't it? That is all correct, and the Administrative Law Judge also addressed those issues and said that does not speak to whether it is for commercial navigation or navigation for pleasure craft just to protect bridge. Okay, so what I thought was odd about the ALJ's opinion is the ALJ recites a test of being capable of commercial navigation, but then seems to apply whether in fact it's being navigated commercially. If you apply the test that ALJ articulated, then shouldn't petitioner prevail here? It's a hard question to answer. The evidence shows that yes, it is of 10-foot depth as of 2008. With the siltation, we don't know what the depth is in 2011 because there wasn't a study. We don't know that there's any dredging that has gone on from 2008 to 2011, 12, and 13. You didn't dispute this factually. You didn't put any contrary evidence. The only evidence we have in the record is of the state of this in 2008, and you don't factually dispute that was the draw a line and require that it be large ocean-going barges and that anything short of that would not make the waters navigable, even if we're looking at capable of navigation rather than whether it's currently being actually used that way. Is it your position that it's only large ocean-going barges that would render water navigable? No, I don't think that large ocean-going barges would be the test. I think that you could have smaller barges or tugboats that may be navigable at that in the river. As the report addresses, there are issues with the regarding the width of the rivers at some portions for the boats to safely turn around. I'm not sure if the navigation channel, we know what the width of the river is. We don't know how wide the navigation channel would be to allow them to turn around at that point in the river. Okay, but you didn't dispute that factually. No, we do not. And we do have in the record the core report that says that it considers the commercially navigable portion of the river to extend up to the bridges. You've quoted it as extending only to the confluence of mile 8.1, but it's actually just describing bridges that extend from the confluence to mile 8.1 and suggests that the navigability of those waters goes even beyond that point. So, with that in the record, why isn't that in your agreement that smaller boats, tugboats could render it navigable with those two things in place? Why don't we have here navigable in fact waters, an error on the part of the ALJ? Well, it's a hard question. I don't know how to answer that. It's quite possible it could be navigable at that point, but that's not the findings that the ALJ and the Benefits Review Board made. You think the ALJ made a mistake? I don't think the ALJs are infallible. I mean, it is a possibility, but in this case, I don't think the waters, or she found that the waters are not navigable at that point in the bridge, so that is the position I have to take. I think the Erie Canal was built at 40 feet wide by four feet deep. This is substantially wider and deeper than these classic canals and locks. You're not taking the position that there's any problem with that with the depth, it's only that it's possible that it's silted up in there for years. I think the correlation with the Erie Canal is a little misplaced in that the lock, as you described it, is 40 feet deep. We only know the navigational channel at this point in the river to be 10 feet. We also know that the Erie Canal is built on a system of locks and the ships only move on one-way traffic and are turning around either at the Great Lakes or in the Atlantic Ocean, or the, I'm sorry, the St. Lawrence Seaway, where it lets out. We're not saying that they're turning around in the channel. So then why do you require an ability to turn around here when there's nowhere upstream to turn around? We don't know if there's any place for the barges or boats to turn around and to navigate. With a canal system, you have an outlet. I'm sorry, based on your experience, do all barges need to make a turn as opposed to just heading in the other direction? Oh, you have to have, at the very least, have a tugboat that can move around the barge to the other direction and hook up and push it in the other direction. So some vessel is going to have to turn around at some point to be able to orient the motors in the direction that they want to move the vessel. Council, if we conclude that it was an error for the ALJ to limit navigable waters to large barges, as it seems to have done, what would the proper disposition be? Would you urge that we then remand or that we can decide on this record whether we have in fact navigable in fact waters? I think if you were saying it's the wrong, she applied the wrong legal standard, I would urge a remand so she can apply the correct legal standard to the facts. Is there anything you would do differently on remand? Is there anything left to argue on remand? Well, in this case, even if you make the decision that the river in fact was navigable, the only issue before the court was jurisdiction. So it is going to go back to the court anyways for additional factual findings regarding the amount of hearing loss, attorney's fees, and hearing aids. So it would go there as a matter of course. But let me, I think if we sent it, if we remanded it, would you supplement the record? What evidence would you supplement the record with to suggest that the river there is not navigable in fact? I would not supplement the record. You'd rest on the record? Yes, Your Honor. All right. Well, unless my colleagues have additional questions at this point, Mr. Thompson, that is your time expired. So we will allow a couple minutes on rebuttal. Thank you, Your Honor. Thank you, Your Honor. I'll be very brief. First, I want to address the idea of recreational vessels. Mr. Thompson in the ALJ said, well, how do we know that the navigation lights and the fender system, the depth gauges and all of this was for commercial maritime activity and not for recreational activity? There's a case law from the Supreme Court that says that the use of a body of water by recreational vessels stands as evidence of navigability. So what the ALJ did wrong, I think, is to take evidence of navigability and in fact, treat it as evidence of non-navigability. In other words, the ability of a commercial, of a recreational vessel to get up to the Route 3 bridge is evidence of the possibility of commercial activity by vessels at that same location. Of course, they'd be small, low draft vessels. Speaking of which, I just wanted to add, it's a curiosity to me that we're arguing about the navigability of the Passaic River with a navigation channel of 10 feet a width of about 125 feet. When the vessel, the Daniel Ball, the vessel that gave us the test everyone likes to apply, drew two feet of water. The Daniel Ball herself could have sailed up the Passaic River. Now that vessel, which gives us the test, could sail up the Passaic River. We have an administrative law judge that says that river is not navigable. I find that to be a real puzzle. In addition, besides that, I wanted to go very quickly to the George case referred to by Mr. Thompson. That involved a river called the American River. That was an inland waterway and it was non-tidal. So then to tie back to what Mr. Bush was saying, I too was curious as to why are we not seeing the tidal tests more frequently in case law. I pulled out a sample of cases and it's essentially because the cases where navigability has been tested have been primarily non-tidal bodies of water. So the cases that were cited by Mr. Thompson in his letter, one was Three Boogies, the other one was Livingston, and I think he made a brief reference to the Morganti case from the Second Circuit. All three of those cases involved inland bodies of water. One was Lake Cayuga, one of the Finger Lakes. The other one was the Lake of the Ozarks, also an inland body of water. And the other one was the Norfolk River, an inland river in the Midwest. So I just don't think there's been an opportunity to bring this up before. And I think the issue that's before this court is extremely important and that's what tests will apply within when there's a dispute of navigability within the tidal waters. And as I read Stokoe and this court's later decision in American Dredging and looking over the history of ebb and flow test, within tidal waters, tidal coastal waters, the test to apply to determine administrative jurisdiction and therefore jurisdiction under the Longshore Act is the ebb and flow test, not the navigable in fact test. Thank you. All right. Thank you very much to all for excellent arguments today. We will take this very interesting case under advisement.